IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DIANE E. FRITSON,

                          Plaintiff,

                                v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

                         Defendant.

_____

Civil No. 05-6313-ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

       Plaintiff, Diane E. Fritson ("Fritson"), seeks judicial review of the Social Security

Commissioner's final decision denying her application for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act.  This court has jurisdiction under 42 USC §§ 405(g)

1 - FINDINGS AND RECOMMENDATION

and 1383(c).  The Commissioner's decision should be reversed and remanded for payment of benefits.

## BACKGROUND

Born in 1955, Fritson completed high school and two years of college.  Tr. 66, 87.[1]  She served in the Army and the Reserves as a medical assistant until her honorable discharge in 1992.  Tr. 493, 499.  From 1992 through 2000, she worked at a variety of jobs (foster home caregiver, phlebotomist, bakery assistant, nurse's aid, seed lab technician, store clerk, respiratory therapy assistant, dietary counselor, occupational therapy assistant, and dietary clerk), most of which lasted only a few months.  Tr. 82, 88, 104.

On January 31, 2001, Fritson filed an application for DIB, alleging a disability due to post-traumatic stress disorder ("PTSD") and major depression beginning December 1, 2000.  Tr. 66, 81.  After her application was denied, a hearing was held before an ALJ on October 22, 2003.  Tr.  477-524.  On January 20, 2004, the ALJ found Fritson not disabled.  Tr. 395-403.  The Appeals Council remanded the case to the ALJ for consideration of the testimony of Friston's husband, Robert Fritson.  Tr. 412-13.

From April 30 through August 23, 2004, Fritson tried working as a prep cook, but had to quit when she had a nervous breakdown.  Tr. 537.  After a supplemental hearing held on September 17, 2004 (Tr. 525-69), the ALJ issued a second decision in March 2005, finding Mr. Fritson's testimony credible to the extent that it was consistent with the medical reports, but

---

[1]Citations "Tr." refer to indicated pages in the official transcript of the administrative record filed with the Commissioner's Answer April 6, 2006 (Docket #8).

2 - FINDINGS AND RECOMMENDATION

again finding Fritson not disabled.  Tr. 18-24.  The Commissioner's decision became final on

August 15, 2005, when the Appeals Council denied review.  Tr. 11-13.

## DISABILITY ANALYSIS

The Commissioner engages in a sequential process encompassing between one and five

steps in determining disability under the meaning of the Act.  20 CFR § 404.1520; *Bowen v.*

*Yuckert*, 482 US 137, 140 - 142 (1987).  Fritson challenges the ALJ's evaluation of the evidence

and his conclusions at step five.

At step one, the ALJ determines if the claimant is performing substantial gainful activity.

If she is, the claimant is not disabled.  20 CFR § 404.1520(4)(I).  At step two, the ALJ

determines if the claimant has "a severe medically determinable physical or mental impairment"

that meets the twelve month duration requirement.  20 CFR §§ 404.1509; 404.1520(4)(ii).  If the

claimant does not have such a severe impairment, she is not disabled.  *Id.*

At step three, the ALJ determines if the severe impairment meets or equals a "listed"

impairment in the regulations.  20 CFR § 404.1520(4)(iii).  If the impairment is determined to

equal a listed impairment, the claimant is disabled.

If adjudication proceeds beyond step three the ALJ must first evaluate medical and other

relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The

claimant's RFC is an assessment of work-related activities the claimant may still perform on a

regular and continuing basis, despite limitations imposed by his impairments. 20 CFR

§ 404.1520(e), Social Security Ruling ("SSR") 96-8p.  The ALJ uses this information to

determine if the claimant can perform past relevant work at step four.  20 CFR §

404.1520(a)(4)(iv).  If the claimant cannot perform past relevant work, the ALJ must determine

if the claimant can perform other work in the national economy at step five.  *Yuckert*, 482 US at

142; *Tackett v. Apfel*, 180 F3d 1094, 1098 (9th Cir 1999); 20 CFR 404.1520(a)(4)(v).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at

1098.  If the process reaches the fifth step the burden shifts to the Commissioner to show that

jobs exist in the national economy in the claimant's residual functional capacity.  *Id.*  If the

Commissioner meets this burden the claimant is not disabled.  20 CFR §  404.1566.

## THE ALJ'S FINDINGS

The ALJ found that Fritson's severe impairments include "a personality disorder

manifested as a conduct disorder and an affective mood disorder."  Tr. 19, 24.  However, he

found Fritson "not entirely credible" regarding her alleged impairments and their impact upon

her ability to work.  Tr. 24.  As a result, the ALJ assessed Fritson's RFC as follows:

> The claimant retains the residual functional capacity without
> physical limitations.  She can perform simple, 1-2 step tasks, or
> more complex tasks not on a continuous basis.  She should have
> only casual and structured contact with co-workers and
> supervisors, but not contact with the public.  Her work should
> follow set routines.

Tr. 24.

Based on this RFC and the testimony of a vocational expert, the ALJ concluded that

Fritson could not return to her past relevant work, but retains the ability to perform significant

work in the national economy as a marker, kitchen helper or commercial cleaner.  Tr. 23-24.

The ALJ therefore found Fritson not disabled under the Act at any time through the date of his

decision.  Tr. 24.

///

///

4 - FINDINGS AND RECOMMENDATION

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Batson v. Comm'r*, 359 F3d 1190, 1193 (9th Cir 2004).  This court must weigh "both the evidence that supports and detracts from the Commissioner's conclusion." *Magallanes v. Bowen*, 881 F2d 747, 751 (9th Cir 1989), *citing Martinz v. Heckler*, 807 F2d. 771, 772 (9th Cir 1986).  The reviewing court "may not substitute its judgement for that of the Commissioner."  *Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading.  *Magallanes*, 881 F2d at 750; *see also Batson*, 359 F3d at 1193.

## FINDINGS

Fritson contends the ALJ improperly assessed her credibility, improperly rejected her testimony, and improperly evaluated medical evidence produced by an examining psychologist and a nurse practitioner.

## I.    Fritson's Credibility

In his March 2005 decision, the ALJ found that Fritson's "statements concerning her impairments and their impact on her ability to work are not entirely credible in light of information contained in the medical reports and elsewhere in the record."  Tr. 20.  That decision incorporates the discussion and analysis of the exhibits in his January 2004 decision, "as well as the conclusions reached."  *Id*.  The ALJ added that the "medical record suggests that [Fritson] has some limitations in functioning, but not to the point of disability" and that "other evidence supports that conclusion."  *Id*.  Other evidence cited by the ALJ is that Fritson "said that she

went to the gym about three times a week, even while she was working," that she worked in 2004 "to pay off credit card debt that she incurred to visit her parents," that she "went on a [one week] trip to Michigan with her husband for a family reunion" without "overwhelming anxiety," that she "can do well when she complies with treatment," and that "her professed lack of medical care due to financial straits is not entirely credible" because she could afford the trip to Michigan.  Tr. 20-21.

In the discussion of Fritson's credibility in January 2004, which was incorporated into the March 2005 decision, the ALJ cited Fritson's daily activities, such as conversing normally, shopping or going to the gym five days a week, leaving the house daily, watching television for four to six hours, driving, walking her dogs, gardening, using the internet, housekeeping, and preparing meals.  Tr. 400.  The ALJ also found that Fritson could remember and discuss what she reads.  *Id*.  Regarding Fritson's statements to an examining psychologist, the ALJ additionally found that she "is not credible in that she has been inconsistent in her reports, often contradicting herself," and that "she requires minimal mental health treatment and generally decreasing medication."  *Id.*

A.    **Credibility Analysis**

The ALJ must provide clear and convincing reasons for discrediting a claimant's testimony regarding severity of symptoms.  *Smolen v. Chater*, 80 F3d 1273, 1284 (9th Cir 1996).  The ALJ's findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."  *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995).  In making his credibility findings, the ALJ may consider the claimant's treatment history and observations of physicians regarding symptoms.  *Smolen*, 80 F3d at 1284.

6 - FINDINGS AND RECOMMENDATION

The ALJ may also consider the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Id.* Additionally, the ALJ may employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant. *Id.*

> **B.**    **Activities of Daily Living and Contradictions**

The ALJ cited Fritson's various activities of daily living to support her lack of credibility. However, the ALJ's reliance on Fritson's activities of daily living does not distinguish between her ability to engage in sporadic activities and her ability to function in a work setting. Such a distinction is relevant. Daily activities inconsistent with alleged disability may support a negative credibility finding, but sporadic completion of daily living activities, such as watching television, housekeeping, or preparing meals is not equivalent to full time employment. *See Vertigan v. Halter*, 260 F3d 1044, 1050 (9th Cir 2001). A claimant "need not vegetate in a dark room" to be found disabled. *Cooper v. Bowen*, 815 F2d 557, 561 (9th Cir 1987). The ALJ's failure to address that distinction in this case is critical. Although Fritson can complete minor tasks, her work history indicates that the stress and pressures of a workplace precipitate an emotional collapse. Tr. 476 ("[Fritson] has been unable to complete a normal workweek without interruptions due to her psychological symptoms."); Tr. 491 (anxiety symptoms when working); Tr. 493-94 (anxiety symptoms at several jobs).

While daily living activities do not demonstrate that a claimant can perform sustained work activity, they may illustrate contradictions in a claimant's testimony regarding alleged impairments. *Smolen*, 80 F3d at 1284; *Orteza*, 50 F3d at 750. The ALJ referred to one of Fritson's activities of daily living, namely her use of a gym three times per week, to "contradict

her assertions that she cannot be around people." Tr. 21, 400.  "Physical exercise has been part of [Fritson's] treatment plan" (Tr.  475), and physician-ordered exercise cannot contradict a finding of disability.  *See Reddick v. Chater*, 157 F3d 715, 722 (9th Cir 1998).

Even if the ALJ did not fault Fritson for attempting to exercise, his finding of a contradiction is contrary to both the testimony of Fritson and her husband.  First, it is not clear that Fritson alleged she could not be around any people.  Instead, she complained that she cannot work because she becomes very nervous, cannot communicate very well with others, and has trouble concentrating.  Tr. 486.  Her husband added that she could take being around relatives "in doses" and if she "is not in constant contact."  Tr. 507.  Second, Fritson testified that she only went to the gym during quiet times when it was "not very crowded" (four or five other people) and would leave if it became too crowded.  Tr.  484, 496-97.  Her husband testified that although she tried to go to the gym five days a week, she was "lucky to make three" because she would leave if "there's more than 10 people there" or "more than three out of seven treadmills are in use."  Tr. 503.  As the ALJ acknowledged, Mr. Fritson "confirmed that [Fritson] went to a gym for exercise several times a week, but she did not work out if there were too many people present."  Tr.  21.  Since the ALJ did not reject Mr Fritson's testimony, he could not reasonably conclude that Fritson's gym use contradicts her assertion that she cannot be around people.

The ALJ also found that Fritson's "restaurant job" working as a prep cook for four months in 2004 "contradict[s] her assertions that she cannot be around people."  Tr. 21. However, Fritson mentioned working only with a limited number of people:  two prep cooks, two cooks (one of whom quit) and no management.  Tr. 530-32.  More importantly, she testified that her work attempt was unsuccessful.  The work was sometimes overwhelming because she

8 - FINDINGS AND RECOMMENDATION

felt pressured to get done on time, especially on certain nights when she was there all by herself. Tr. 532-33. She described incidents of crying at work, requiring her husband to come in and stand by one night while she completed her work. Tr. 538. A few times each night, she would shut herself into the bathroom for a few minutes, taking deep breaths and trying to calm down. Tr. 540. She lost weight. *Id.* As a result of the stress, she had to take more and more of her anti-anxiety medication to go to work. Tr. 534. The job ended when she was crying and upset and dumped a quantity of pills into her hands to swallow. Tr. 537-38. Her husband took the pills away from her. *Id.* Her therapist told her that if she did not quit her job, she would end up in the hospital. Tr. 537. Her husband confirmed his wife's difficulty working at this job. Tr. 548-58. In addition, nurse Churchill's progress report dated August 12, 2004, notes that Fritson was unable to handle the stress of the job and was requiring anxiety medications on work days. Tr. 451, 476. Based on this testimony and evidence, which the ALJ did not address, Fritson's work attempt in 2004 precipitated an emotional collapse and confirms, rather than contradicts, her claim that she cannot work due to her psychological condition.

The same is true of the ALJ's suspicion regarding Fritson's credibility because she went on a trip to Michigan with her husband for a family reunion. According to Mr. Fritson, his wife can only be around family in small doses without becoming anxious. Tr. 507.

### C. **Fritson's Medical Record**

The ALJ also questioned Fritson's credibility based upon conflicting reports in her medical records. A medical treatment record may be used as one of several factors in illustrating a claimant's credibility regarding her symptoms. *Smolen*, 80 F3d at 1284.

9 - FINDINGS AND RECOMMENDATION

Two of the contradictions noted by the ALJ are supported by the record.  The ALJ cited Fritson's emergency room visit in February 1999[2] when she reported taking an overdose of Ativan (benzodiazepine) (Tr. 397), although subsequent toxicology reports showed no evidence of such overdose.  Tr. 190.  The ALJ also cited Fritson's reports of self-mutilation (Tr. 400) which clinical observations in September 2000 explicitly negated.  Tr. 187.  No medical evidence supports Fritson's claim of self-mutilation during the period in question.  Because the post-1999 medical record directly contradicts Fritson's reports regarding genuine overdose ingestion and self-mutilation, the ALJ appropriately cited these incidents in his credibility finding.  However, the remainder of the ALJ's analysis lacks clear and convincing reasons.

The ALJ also noted that according to her husband, Fritson attempted suicide on at least 50 occasions over a period of 20 years.  Tr. 555.  He found that this "testimony does not ring as credible" since the treatment record during the relevant period does not reflect that number of suicide attempts.  Tr. 22.  The ALJ is correct that the medical record reveals few suicide attempts.  Fritson twice reported suicidal ideation and once reported a suicide attempt to her healthcare provider between February 1999 and November 2000.  Tr. 180, 187-89.  Fritson did not report suicidal ideation again until March 2002.  Tr. 245.  Furthermore, concurrent treatment notes in February 2002 do not mention depression.[3]  Tr. 192.

However, Fritson and her husband testified that the medical record does not reflect a lack of suicide attempts for two reasons.  First, Fritson has not sought medical care because she could

---

[2]  The ALJ initially referred to a September 2000 emergency room visit, but his narrative (Tr. 397) and exhibit citation ("Exhibit 4F/13") refers to a February 1999 visit.  Tr. 188, 397.

[3]  Although a suicide attempt is a manifestation of severe depressive disorder, social security claimants bear the burden of providing medical evidence in support of their applications.  *Tackett*, 180 F3d at 1098.

10 - FINDINGS AND RECOMMENDATION

not afford it, submitting that visits to the emergency room for each suicide attempt would have

bankrupted her and her husband.  Tr. 543, 555-56.  A claimant cannot be faulted for failing to

seek treatment she cannot afford.  *Gamble v. Chater*, 68 F3d 319, 321 (9th Cir 1990).  However,

the ALJ rejected this explanation:

> Of course, it is noted that the claimant said she could not afford
> emergency room visits, and financial constraints prevented her
> from seeking medical help for her frequent exacerbation of
> symptoms.  But she could afford a trip to Michigan and its
> associated costs (she indicated that her credit card debt for that trip
> was $2,500 to $3,000).  She then stated that these debts were a
> cause for her to go to work.  That sounds reasonable, and her
> professed lack of medical care due to financial constraints is not
> entirely credible.

Tr. 21.

The ALJ also noted that because Mr. Fritson's military retirement provided health

insurance for Fritson, she "is covered by her husband's insurance . . . except for a co-payment."

*Id.*

To explain why Fritson failed to seek medical care in light of her health insurance

coverage, Mr. Fritson testified that their co-pay was 20% and that her hospitalization on one

occasion cost $20,000.  Tr. 555-56.  As a result, he did not take her to the hospital every time she

threatened or attempted suicide, but intervened to stop her.  The ALJ failed to consider this

explanation.  With respect to the Michigan vacation, Mr. Fritson explained that he financed the

vacation with credit cards.  Tr. 567.  Although the ALJ presumably concluded that Mr. Fritson

also could finance his wife's medical treatment with credit cards, that is an unrealistic

expectation given the limited nature of the Fritsons' resources.  Mr. Fritson receives income of

only $1,200 per month from his disability retirement and the record reflects no other sources of

income or assets.  Tr. 546.  Thus, the ALJ's reliance on Fritson's health insurance and vacation to reject her failure to seek treatment is not reasonable.

Second, Mr. Fritson testified that in his experience, once Fritson is stopped in a suicide attempt and her problems are acknowledged by those around her, she is not longer a threat to herself.  Tr. 559.  The ALJ did not address this explanation for failing to seek medical treatment.

As to lack of medical treatment, the ALJ also noted that Fritson sought no medical treatment from April to August 2004 because she "thought that the medications were working," suggesting that she "can do well when she complies with treatment."  Tr. 21.  However, as Fritson testified and as reflected by Churchill's notes, Friston had to take extra medication while working.  Tr. 521, 535.  But even that medication did not enable Fritson to succeed at working.

### D.    Conclusion

In summary, the ALJ did legitimately question Fritson's credibility based on some conflicting reports in her medical records.  However, he erroneously failed to consider Fritson's reported activities of daily living in light of her vocational history and did not fairly address Fritson's symptom testimony.  The testimony by Mr. Fritson regarding heath insurance and family finances supports Fritson's claim that she could not afford treatment for all her suicide attempts.  For these reasons, the ALJ's credibility determination as to Fritson is not supported by clear and convincing reasons.

## II.    Medical Source Statements

An evaluating psychologist, Alison Prescott, Ph D, issued a psychological evaluation of Fritson dated June 22, 2003, that supports her disability claim.  In his 2004 decision, which was incorporated in his 2005 decision, the ALJ concluded that this opinion "cannot be given

significant weight" because Dr. Precott "did not have accurate information" and because Fritson "is not credible in that she has been inconsistent in her reports, often contradicting herself." Tr. 400.  Fritson submits that Dr. Prescott's opinion is uncontradicted, and that the ALJ failed to give "clear and convincing reasons" for rejecting it.

### A.    Legal Standard

Generally, a treating physician is accorded greater weight than an examining physician. *Edlund*, 253 F3d at 1157.  If the opinion of an examining physician is contradicted, then an ALJ need only set out specific and legitimate reasons supported by substantial evidence.  *Bayliss v. Barnhart*, 427 F3d 1211, 1216 (9th Cir 2005).  This evaluation must "set out a detailed and thorough summary of the facts and conflicting clinical evidence."  *Magallanes*, 881 F2d at 751.

### B.    Dr. Prescott's Opinion

Dr. Prescott evaluated Fritson in June 2003 following a referral from Fritson's attorney. Tr. 364.  Prescott's evaluation included a clinical interview, mental status exam, psychological testing, and a review of Fritson's medical records.  Tr. 358-71.  Dr. Prescott subsequently produced an eight page report summarizing her findings and completed a Mental Residual Function Capacity Report ("MRFC") questionnaire.  Tr. 373-374.

According to Friston's reported history, she began experiencing psychiatric symptoms in 1987 after her daughter was molested, which continued to worsen.  Tr. 366.  The medical records in the file begin in 1997 after Fritson moved to Oregon.  According to those records, Fritson has had several psychiatric hospitalizations:  (1) six days in February 1999 for depression and suicidal ideation (Tr. 189); (2) overnight in September 2000 (Tr. 252); (3) nine days in October 2000 for depression and auditory hallucinations (Tr. 160-61).  She continued to exhibit

symptoms of depression and anxiety through December 2000, receiving emergency treatment in November 2000.  Tr. 180, 316-18.  In 2001, her condition was more stable, but she continued to report symptoms of depression and anxiety.  Tr. 305-307, 312.  Her condition worsened again in November 2001 (Tr. 307) and in February and March 2002 and she again received emergency treatment for depression and anxiety.  Tr. 245, 247, 471.  In April 2002, she reported command hallucinations to cut her arms and set the house on fire.  Tr. 301.  Although by June 2002 the hallucinations had resolved, in July she reported episodes of anxiety and some impulses to harm herself when she was anxious.  Tr. 385.

Prescott's mental status exam by Dr. Prescott in June 2003 showed a "depressed and rigid affect" and impaired concentration "with regard to perseveration or sustained attention on subtasks she was less comfortable performing."  Tr. 369.  The cognitive testing "demonstrated good short term memory," including above average performance on an eight digit memory test.  Tr. 369.   Based on this information, Dr. Prescott's diagnostic impression included PTSD and recurrent Major Depression, as well as "severe psychosocial stressors with poor occupational adjustment; poor social adjustment." Tr. 372.  She did not suggest an anxiety diagnosis.  *Id.*

Dr. Prescott's MRFC found *marked* limitations in Fritson's ability to maintain concentration for extended periods, perform activities within a schedule, maintain regular attendance, sustain an ordinary routine without special supervision, complete a normal workday or workweek without interruptions from psychologically based symptoms, accept instructions and respond appropriately to supervisors and set realistic goals and make plans independently of others.  Tr. 373-74.  She found *moderate* limitations in Friston's ability to understand and remember detailed instructions, carry out detailed instructions, work in proximity with others, or

make simple work related decisions.  She also found that Fritson had a *limited* ability to interact with the general public, ask simple questions, be aware of normal workplace hazards, and travel to unfamiliar places or use public transportation.  Tr. 373-74.

###    C.    Analysis

In his 2004 decision, the ALJ noted that Fritson told Dr. Prescott "that she was having panic attack symptoms about twice a month, including incidents of self-mutilation as recently as five months before, and about once a month having flashbacks of past abuse."  Tr. 367, 399. However, he found that her treatment record "shows nothing of the sort."  Tr. 399.  He specifically found no reference to panic attacks in January through June 2003 notes of the mental health visits (immediately before and after Dr. Prescott's evaluation), and also noted that "none of" the records indicate the self mutilation as reported to Dr. Prescott.  Tr. 399-400.  The ALJ was correct as to the lack of references in the medial records, even though he ignored Fritson's reports of panic and anxiety prior in 2001 and 2002 (Tr. 306-07, 380, 385) and of anxiety in the early months of 2003 (Tr. 377-79).

Despite the ALJ's correct reading of the medical record, he failed to recognize that Dr. Prescott did not base her conclusions solely upon Fritson's reported panic attacks or self-mutilation.  Instead, she based them on appropriate clinical examination and testing.  *See Bayliss*, 427 F3d at 1216.  Thus, the ALJ's reference to Fritson's allegedly contradictory reporting does not support his wholesale rejection of Dr. Prescott's opinion.

As additional proof that Fritson was "not entirely forthcoming and was inconsistent in her reporting to Dr. Prescott (Tr. 399), the ALJ noted that Fritson reported receiving a beating at age 14, but later reported to an examining psychologist that it occurred at age 15.  Tr. 188, 364.

15 - FINDINGS AND RECOMMENDATION

However, this minor discrepancy in reporting her age at this incident is not significant and does not reasonably support the ALJ's conclusion.

Furthermore, the other medical records do not contradict Dr. Prescott's opinion. Fritson saw her treating physician, Dr. Michelle Birdseye, MD, 14 times between October 1997 and February 2002. Tr. 192-213. Although Dr. Birdseye did not mention Fritson's anxiety or other psychological symptoms, those visits were solely to obtain treatment for physical problems, not to obtain treatment for her emotional disorders. Dr. Birdseye was aware the Fritson visited Churchill, the nurse practitioner, for treatment of her psychological problems. Tr. 199.

Because Dr. Prescott is an examining physician whose opinion is not contradicted by any other examining or treating physician, the ALJ was required to give clear and convincing reasons for discrediting her opinion. He failed to do so. As a result, Dr. Prescott's opinion should be credited.[4]

## II.    Lay Witness Testimony

### A.    Evaluating Lay Witness Testimony

The ALJ has a duty to consider lay witness testimony. 20 CFR §§ 404.1513(d) & 404.1545(a)(3); *Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir 2001). Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition. *Dodrill v. Shalala*, 12 F3d 915, 918-19 (9th Cir 1993). The

---

[4] The Commissioner argues that the opinions of the nonexamining psychologists support a finding that Fritson is able to work. "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester v. Chater*, 81 F3d 821, 831 (9th Cir 1995). Moreover, these doctors' opinions were made without first reviewing Dr. Prescott's report. Tr. 358. Dr. Prescott examined Fritson after Dr. Hennings issued his opinion. Tr. 285, 364. Dr. Rethinger appeared to be unaware of Dr. Prescott's report although his opinion was written four days afterward. Tr. 358.

ALJ may not reject such testimony without comment, but he may reject lay testimony inconsistent with medical evidence. *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996); *Lewis*, 236 F3d at 512. If an ALJ rejects lay witness testimony entirely, he must give reasons germane to the witness. *Nguyen*, 100 F3d at 1467.

   **B.**   **Nurse Practitioner**

   Fritson argues that the opinion of Churchill, a nurse practitioner, should be given greater consideration due to privileges accorded nurse practitioners under Oregon law. Social Security regulations clearly state that nurse practitioners are not "acceptable medical sources." 20 CFR § 404.1513(d)(1). If a nurse practitioner is working under the supervision of a physician in a team approach, then she may be construed as an element of an acceptable medical source. *Gomez v. Chater*, 74 F3d 967, 971 (9th Cir 1996). No evidence suggests that Churchill treated Fritson under the supervision of a physician. Therefore, Churchill is evaluated as a lay witness. However, such a lay witness must be considered under various factors such as how long the source has known the claimant, how consistent the opinion is with other evidence, or whether the source has a speciality or area of expertise related to the individual's impairment, and "any other factors that tend to support or refute the opinion." SSR 06-03p (available at 2006 WL 2329939), **4-5.

   Churchill's notes show that she met with Fritson at monthly intervals between March 1999 and May 2002 and periodically thereafter. Tr. 300-37, 443-45, 449-51, 473-75. These notes consistently reference PTSD between March 1999 and February 2005. Tr. 300, 302-05, 307, 310, 312, 315-16, 323-25, 473, 475. Between January and March 2001 Churchill noted that Fritson's PTSD was "stable." Tr. 312, 315, 324. These notes give little indication regarding

how Churchill reached her PTSD assessment, other than referring to "intrusive thoughts" without elaboration.

In addition to PTSD, Churchill also diagnosed "major depressive disorder, recurrent, moderate" in March 1999. Tr. 336. Churchill repeated this diagnosis in between April 1999 and March 2000. Tr. 325-26, 328-29, 331, 333-34. However, subsequent records produced between April 2000 and February 2005 do not reflect a diagnosis of depression. Tr. 300, 324, 473, 475. Churchill additionally noted anxiety symptoms on three occasions between December 2001 and July 2002, but never suggested an anxiety diagnosis. Tr. 306, 316, 317, 385.

In April 2002, Churchill noted that Fritson reported command hallucinations to mutilate herself and set her house on fire. Tr. 301. Churchill's notes show Fritson reported these symptoms were triggered by rejection of her SSI claim. Tr. 301. Churchill's notes contain no other reference to hallucinations, and no medical evidence establishes that Friston actually mutilated herself during the period in question. Churchill's notes do not clearly indicate whether Fritson simply reported these urges to self-mutilate or actively threatened to do so.

In May 2005 Churchill submitted a letter to the record stating that Fritson's diagnoses include PTSD and major depression. Tr. 475. Churchill also stated that Fritson "has not been able to complete a normal workweek without interruptions due to her psychological symptoms," and suggested she was unable to handle the stress of working as a cook or janitor in August 2004. *Id.* Churchill finally stated that Fritson's trip to Michigan was at her husband's insistence and that Fritson's gym use was part of her treatment plan. *Id.*

The ALJ appropriately credited Churchill's observations regarding Fritson's intermittent agitation, sleep disturbances and mood swings. Tr. 20. Because Churchill is properly evaluated

as a lay witness, the ALJ is not required to credit her medical diagnoses. *Nguyen*, 100 F3d at 1467.   However, he is required to credit her eyewitness observations absent a germane reason for not doing so.  The ALJ failed to give such a germane reason.  Because Dr. Prescott's evaluation corroborates Churchill's notes, Churchill's testimony regarding Fritson's symptoms and limited ability to function in a work environment should be credited.

### B.    Robert Fritson

Fritson asserts that the ALJ inappropriately found her husband, Robert Fritson, not credible.  This case was remanded to the ALJ by the Appeals Council because the ALJ's first decision was silent regarding Mr. Fritson's testimony.  Tr. 412.  In his second decision, the ALJ reiterated Mr. Fritson's testimony at length and cited his military medical experience.  Tr. 21-22. The ALJ noted that Mr. Fritson is not a medical expert under social security rules and found his testimony "credible to the extent that it is consistent with the claimant's medical reports."  Tr. 22.   It is not clear what portion of Mr. Fritson's testimony the ALJ did not find credible, but, as discussed above, the ALJ did reject Mr. Fritson's reports of his wife's many suicide attempts based on the absence of medical care for them in the medical records.  For the reasons discussed above, the ALJ erred in that regard.

Mr. Fritson also described his wife as volatile, hyper-sensitive, anxious, and limited by her extreme emotional reactions to ordinary stressors.  When Friston shops, there is only a 50% chance that she will come home with the items she went for, and she will bring something completely unrelated instead.  Tr. 505.  She will not visit her friend at her house.  *Id*.  He described her hiding and crying in the closet every second or third month.  Tr. 506.  She is also very sensitive to comments that are not intended to hurt her.  Tr. 507.  Driving is a significant

stress to her.  *Id*.  He also described his wife as being unable to perform with any time constraint.
Tr. 567-68.  When Fritson began working in 2004, she would sit in her rocking chair and cry
endlessly on her days off or do nervous activities such as moving things around or making laps
around the kitchen island.  Tr. 566-67.  She would call him from work nearly every day to say
she was having problems (Tr. 548, 550) and on perhaps three occasions, asked him to come to
her workplace for moral support.  Tr. 550-51.  He would stand and watch his wife wash pots and
pans before the couple returned home.  *Id*.  She cried on a daily basis, even though she was
taking medication.  Tr. 549.  She would sit in her rocking chair and cry for eight, ten, or 12 hours
at a time.  *Id*.  The ALJ did not credit this testimony by including the limitations described by
Mr. Fritson into the RFC assessment.

Omission of lay witness observations of a claimant in a work environment is not
harmless.  *Stout v. Comm'r*, 454 F3d 1050, 1055-56 (9th Cir 2006).  Mr. Fritson corroborated his
wife's reports concerning her emotional problems at home and at work in 2004.  Such testimony
reflects Fritson's ability to function in the workplace, is consistent with Dr. Prescott's opinion
and with Churchill's lay witness observations, and should be credited.

## III.  The ALJ's Step Five Finding

Fritson finally contends the ALJ erred in finding she could perform work in the national
economy.  Fritson bases her argument upon Dr. Prescott's report.  At the October 2003 hearing,
the ALJ solicited testimony from a vocational expert ("VE").  Tr. 514-18.  The VE testified that
if Dr. Prescott's report were credited, Fritson would be unable to perform past relevant work and
unable to perform work existing in the national economy at step five.  Tr. 517-18.

Because the ALJ failed to give legally sufficient reasons for disregarding Dr. Prescott and the observations of Churhill and Mr. Fritson, their testimony should be credited. After crediting their testimony, there are no outstanding issues to be resolved before determining Fritson is disabled within the meaning of the Act. Furthermore, it is clear from the record that the ALJ would be required to find Fritson disabled if the evidence were credited. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir 2000).

A remand for benefits rather than corrective administrative proceedings may be appropriate where the Commissioner's errors have already caused long delay in determining the claim. *See Kennedy v. Apfel*, 2000 WL 913690 (D Or 2000). Permitting the Commissioner a third opportunity to properly develop the record is not justified.

In conclusion, crediting the testimony above establishes that Fritson's condition prevents her from performing work in the national economy at step five. The repeated failure to appropriately address these opinions convinces this court that further delay to correct administrative proceedings would not be appropriate. Accordingly, this court should remand for the calculation and award of benefits.

## **RECOMMENDATION**

For the reasons set forth above, the Commissioner's decision that Fritson did not suffer from disability and is not entitled to benefits under Title II of the Social Security Act is not based upon correct legal standards and is not supported by substantial evidence. Thus, the ALJ's determination that Fritson did not suffer from a disability should be reversed and remanded pursuant to sentence four of 42 USC § 405(g) for calculation and award of benefits.

///

21 - FINDINGS AND RECOMMENDATION

## **SCHEDULING ORDER**

Objections to the Findings and Recommendation, if any, are due by December 29, 2006. If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 7th day of December, 2006.

/s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

22 - FINDINGS AND RECOMMENDATION